THOMPSON v. MATTHIASEN et al.

(Supreme Court, Appellate Division, First Department. May 31, 1912.)

1. LIBEL AND SLANDER (§ 18*)—LIBELOUS PUBLICATION.

Where an attorney procured the publication in a newspaper of an article laudatory of his manner of conducting a personal injury action for a client and the recovery of a large sum for him, a publication without malice in another newspaper, in the form of a reply, truthfully stating the facts and fairly commenting on the attorney's conduct in the case, was not libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 1–9; Dec. Dig. § 18.*]

2. LIBEL AND SLANDER (§ 114*)—LIBELOUS ARTICLE—DAMAGES.

Where a newspaper article, criticising an attorney who had successfully prosecuted a personal injury action for a client, and charging him with

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plundering the client because deducting all charges and compensation from the partial cash payment made, and falsely charging the attorney with causing the arrest of his client, was inspired, in part at least, by the attorney procuring a publication in another newspaper commending his conduct in the case, and there was nothing to show that the attorney sustained any damages in consequence of the article, a verdict for nominal damages would not be disturbed.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. § 352; Dec. Dig. § 114.*]

3. LIBEL AND SLANDER (§ 123*)—LIBELOUS PUBLICATION—ISSUES.

Where, in an action for a libel published in a foreign language, the parties testifying in the case disagreed as to the correct translation of the alleged libelous article, the question of the correct meaning of the article was for the jury.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 356–364; Dec. Dig. § 123.*]

4. LIBEL AND SLANDER (§ 18*)—LIBELOUS PUBLICATION.

A newspaper article, making the basis of a discussion on the subject of contingent fees a personal injury action successfully prosecuted by an attorney for a contingent fee, and stating that the writer was surprised "that not near all Danes could see anything dishonorable or improper in that the attorney demanded as his fee one-third, and besides, took his third part out of the first payment which the cripple received, while the latter must wait ten years before he received all of the two-thirds which the attorney left him," followed by an opinion of the writer and the attitude of the profession with respect to retainers on the basis of contingent fees, and stating that in the opinion of the writer many negligence actions were fraudulent, etc., is not libelous per se.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 1–9; Dec. Dig. § 18.*]

5. LIBEL AND SLANDER (§ 18*)—LIBELOUS PUBLICATION.

It is not libelous to say that an attorney is not particularly prominent, or to refer to him as one of ordinary or average ability.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 1–9; Dec. Dig. § 18.*]

Miller, J., dissenting.

Appeal from Special Term, New York County.

Action by Thomas Langland Thompson against Karl Matthiasen and another. From an order granting a motion to set aside a verdict of six cents as inadequate, defendants appeal. Reversed, and verdict reinstated.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Wilbur F. Earp, of New York City (Franz Neilson, of New York City, on the brief), for appellants.

Raymond Ballantine, of New York City, for respondent.

LAUGHLIN, J. This action is brought to recover *general* damages alleged to have been sustained by plaintiff in his profession as an attorney and counselor at law by the publication of five articles in a weekly Danish newspaper known as "Nordlyset," of which the defendant Matthiasen was the proprietor, and defendant Strandvold was the editor. The plaintiff was admitted to practice in the court

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of this state in 1904, and in the federal courts as well. The newspaper had a circulation of about 2,000 copies, and it was published in the borough of Brooklyn, and circulated in New York and throughout the United States and Canada, and to some extent in Denmark. The articles, with the exception of one which was withdrawn from the jury, related to and commented on and constituted, in part, a reply to an article consisting of an interview which the plaintiff, at the request of one Holm, who owned and published two newspapers in Danish, gave for publication, concerning an action which he had brought for one Axel Holm to recover damages for personal injuries and concerning himself and comments thereon by the newspaper. The interview with comments was first published in the Norwegian-American, and it was rewritten and together with a photograph of the plaintiff, which he furnished to the proprietor, published in the Danish-American on the 23d day of February, 1910. This article purported to give the nature and history of the action and a brief sketch of the plaintiff's career, setting forth his theory of his success, and his views concerning politics and certain public offices, and it was highly commendatory of him as a citizen and laudatory of him professionally, and of his ability as displayed in *winning* $20,000 for his client Holm; and it plainly conveyed the impression that he became interested in the case through a spirit of charity and willingly sacrificed his valuable time gratuitously to help a fellow countryman. The article closed with a letter from the client purporting to extend thanks to those who had assisted him, including his special guardian, who had raised funds for him, and his doctor and editor, and purported to state that the plaintiff as his attorney "has done able work for me." The letter of thanks was designed to give public recognition to those who had assisted the client, but when signed by the client it contained no reference to his attorney, whom he subsequently stated he considered well paid for the services rendered, and that sentence was added at the newspaper offices.

[1] The first alleged libelous article was published on the 10th of March, 1910, and it set forth a letter addressed to "Nordlyset" from the father of the plaintiff's client, challenging the correctness of many of the statements in the article published in the Danish-American, and setting forth that the verdict had been reduced in some way unknown to him, or to his son, to $17,500, and that $5,914 of the sum received in cash was deducted as expenses and attorneys' fees, leaving a balance of only $2,836 received by the client in cash, and the remainder was to be paid in ten annual installments, for each of which the client received a note, and asserting that the article was written as a self-advertisement for plaintiff and the special guardian. It is stated in this article that, on receiving this letter, Nordlyset investigated the matter and learned from the plaintiff's client that his father's letter was true, and that the letter of thanks in the other paper contained no reference to the plaintiff, and from the special guardian it was learned that the $2,500 was deducted from the verdict by a compromise to prevent an appeal and delay, and that one half of the balance was paid in cash and the other half was to be paid in equal annual install-

ments, and he conceded that he had collected contributions for the plaintiff's client to the extent of about $250, part of which he still retained. This article was not libelous per se. The reduction by $2,500 is fully explained in the very article of which complaint is made. The plaintiff, by submitting to the interview, invited public comment and criticism on his utterances and on his conduct towards his client. There was no reflection with respect to his professional ability; but there was, perhaps, an implied criticism of the basis of the settlement with his client. There was, however, no misstatement of fact, and the comment and criticism were apparently fair and honest, and made to disprove the assertions contained in the former publication. The articles were apparently written to advertise commendably the plaintiff and the special guardian, and any reader would infer that it was self-advertising, although the plaintiff, according to his testimony, did not know that his entire interview was to be published. The defendants had no malice towards the plaintiff, and, in fact, did not know him at all.

[2] The third and fourth articles were published on April 21, 1910, in the same issue, but in different columns. In the first of these reference is made to the newspaper controversy and the Axel Holm case, and to the fact that the award of such a large amount made him a well-known man and attracted considerable attention both here and in Denmark. The material part of this article is as follows:

"From the moment they noticed that there was money in Axel Holm's case, the 'charity' was awakened in his brave fellow men. That they allowed themselves to be paid for this charity in ringing coin has less to do with the case; the consciousness that at least Axel Holm did not go home entirely plundered and fleeced was sufficient for them.

"Out of the large damages of $20,000 awarded by him, Axel Holm went home with about $1,500—we say it and inscribe it—fifteen hundred dollars—that is all that has been left him.

"Up to the very last moment they were after him, yes, even his own attorney, who, though he had made several thousand dollars on him, did not blush—24 hours before his departure—on behalf of Axel Holm's uncle to institute an arrest whereby they gave him the choice between paying 123 dollars or being stopped in his departure for Denmark. Yes; this was, no doubt, the finish."

While this article in part relates to the plaintiff, it is evident that it also relates to others. The ground of the complaint with respect to the specific references in this article to the plaintiff is that it charged that he caused the arrest of his client, which is not true. The plaintiff testified to a translation of the article showing that it charged that he had instituted "an arrest"; but the defendant editor testified that the correct translation was "an arrest action." And it appears that the plaintiff's former client could have been arrested in the action on the ground that he was leaving the jurisdiction with intent to defraud creditors. In submitting the case to the jury, the court did not allude to the controversy over the translation, or allude specifically to this part of the article.

[3] The jury were at liberty to find that the plaintiff's translation was incorrect, and it cannot be said that their verdict in that regard is against the weight of the evidence, for it depends upon which of the translators, both of whom were interested parties, gave the cor-

rect meaning of the article. In other respects the charge with respect to instituting the action was true. It is not entirely clear that the other parts of the article related to the plaintiff; but one who had read the former articles might consider that he was included and severely criticised for having participated in plundering and fleecing his client, although that inference does not necessarily follow. It is perfectly obvious, however, that the basis of the criticism and what was alluded to as plundering and fleecing was the fact that all charges were deducted from the cash payment, and that the client was left with but a comparatively small amount of cash, which was true. When the action was brought, the client was an infant; but, before it was tried, he became of age and then signed a formal agreement to pay the plaintiff's firm one-third of the amount recovered and the disbursements in addition in the event of success. The plaintiff employed a New Jersey attorney, to whom he agreed to give one-quarter of his contingent fee. In the settlement with his client he deducted his one-third and the disbursements in cash and in addition $20, being the amount he paid to the same New Jersey lawyer for consultation in drafting the complaint. This item of $20 manifestly was an improper charge. The plaintiff apparently insisted upon receiving all that was coming to him in cash, and his client was obliged to take 10 notes of the General Chemical Company, against whom the verdict was rendered, in equal amounts, one of which was payable annually secured by a surety company bond.

If a newspaper should originate an inquiry into the relations between an attorney and his client and criticise his charges and his relations with his client, quite a different question would be presented for decision. But here an article was published which was inspired in part, at least, by the plaintiff concerning himself and the Holm action, and commanding his conduct with respect to the case, and conveying the erroneous impression that he was actuated by charitable motives and had "won" $20,000 for his client, when in fact he was to receive one-third for his services, and it became a fair subject for public comment and criticism. There is no basis upon which it can be said that the plaintiff was entitled to a substantial verdict, for it is not at all certain that he sustained injury by the article. It is peculiarly a case in which the verdict of the jury for nominal damages should not be disturbed. The other article published in the same issue contains nothing libelous per se. It comments on articles relating to the article or to letters written by the plaintiff or by the special guardian relating to it, and criticises them for attempting to obtain credit for rendering services gratuitously for which they were liberally paid, and it asserts the fact that of the $8,500 paid in cash on the settlement the plaintiff "took $5,910 as his part in this widely advertised charity affair," and that when the boy sailed for home he was in possession of $1,500 of the $8,500, and closed the article with, "The rest is silence." It may be that this charged inferentially that the special guardian or others took the difference; but it could not prejudice the plaintiff, for the amount he received is correctly stated.

[4] The last article was a letter from the librarian in charge of the

law section of the New York Public Library, in which he makes the Holm case the basis of a discussion on the subject of contingent fees. The article was headed in large type "FEES OF ATTORNEYS," and underneath that "A little reflection relative to claims about 'Percentage of the Proceeds.'" The only libel in that article is a statement that to his surprise the writer found:

"That not near all Danes could see anything dishonorable or improper in that the attorney demanded as his fee one-third, and, besides, took this third part out of the first payment which the cripple received, while the latter must wait ten years before he receives all of the two-thirds which the attorney left him."

The writer then proceeded to give his own opinion and the opinion and attitude of the profession with respect to retainers on the basis of contingent fees, and expressed the opinion that many negligence actions are fraudulent. The views expressed are those not infrequently expressed at meetings of bar associations when the subject is up for discussion. They contained no particular reference to the plaintiff, and it was so conceded by his attorney on the trial. It is urged, however, that the article charged the plaintiff with dishonorable and improper conduct. But the sting of that was removed by the specific explanation of what was meant in the discussion of contingent retainers, and in which it was stated that such retainers are not prohibited by law or by the bar associations, and it was conceded that some honorable members of the profession make such contracts with their clients.

[5] The writer of the article in discussing the question as to whether the fee charged in the Holm case was a reasonable fee to be charged by an attorney of "mediocre" ability, according to the translation given by the plaintiff; but according to the editor the meaning of the Danish words is "an attorney not particularly prominent." Manifestly, there was no intention to reflect on the plaintiff's professional ability. The action had been conducted successfully. He had not been admitted to the bar many years, and surely it would not be libelous to say that he was not particularly prominent; nor do I think it libelous to refer to an attorney as of ordinary or average ability, for greater ability is neither required nor presumed. The case was fairly tried, and no error appeared to have been committed either upon the trial or in submitting the case to the jury. The plaintiff, having participated in starting this newspaper controversy by voluntarily submitting to an interview, cannot complain of fair and honest criticism and discussion of his conduct, and, in so far as any of these articles exceed that, the line was barely crossed, and it is not at all clear that they injured him professionally, and therefore the verdict of the jury should have been permitted to stand.

It follows that the order should be reversed, with costs to appellant, and the verdict reinstated.

INGRAHAM, P. J., and McLAUGHLIN and DOWLING, JJ., concur. MILLER, J., dissents.